## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF TEXAS

|  |  |  |
|---|---|---|
| IN RE:  KITEC PLUMBING SYSTEM | ) | MDL 3:09-md-02098 |
| PRODUCTS LIABILITY LITIGATION | ) | |
|  | ) | |

## OBJECTIONS TO THE PROPOSED SETTLEMENT
## AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL
## AND BRIEF IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ...................................................................................................... 5

A.   The Release Is Overbroad Because It Includes Claims
     Against The Homebuilders ......................................................................... 5

     1.   Pending actions raise valuable claims against the homebuilders ............... 6

     2.   Previous actions against homebuilders have produced
          multi-million dollar recoveries ................................................................ 9

     3.   As a result of the failure to bring the homebuilders to the table, the
          Proposed Settlement and release would deprive the class of the
          opportunity to be made whole ................................................................ 10

B.   The Court Should Refuse To Approve The Settlement Because, As A Result Of
     The Failure To Bring The Homebuilders To The Table, The Settling Parties Lack
     Valuable Information That Would Enable Them To Provide Individualized Notice
     To The Class ............................................................................................ 12

C.   The Court Should Refuse To Approve The Settlement Because The Opt Out
     Procedures Are Inadequate To Protect The Due Process Rights Of Absent Class
     Members .................................................................................................. 15

D.   The Court Should Refuse To Approve The Proposed Settlement Because It
     Unfairly Seeks To Deprive Class Members Of Their Right To Arbitrate Their
     Claims Against The Homebuilders, And To Enjoin Ongoing Proceedings .......... 19

     1.   The proposed injunction against completion of ongoing arbitration
          proceedings would frustrate the intent of the contracting parties and would
          be contrary to the Federal Arbitration Act ............................................. 20

     2.   The proposed injunction against the ongoing state court proceedings
          should not be approved because it is contrary to the
          Anti-Injunction Act ............................................................................... 23

E.   If The Court Overrules These Objections And Preliminarily Approves The
     Settlement, Objectors Request That The Court Certify The Issues For
     Interlocutory Appeal ................................................................................. 24

III. CONCLUSION ................................................................................................. 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

Acosta v. Trans Union, LLC
243 F.R.D. 377 (C.D. Cal. 2007) ........................................................................... 18

*Adams v. United States*
317 U.S. 269 (1942) .............................................................................................. 25

*Amchem Products, Inc. v. Windsor*
521 U.S. 591 (1997) ........................................................................................ 17, 20

*Berland v. Mach*
48 F.R.D. 121 (S.D.N.Y. 1969) ............................................................................ 13

*Carlough v. Amchem Products, Inc.*
10 F.3d 189 (3d Cir. 1993) ................................................................................... 16

Crawford v. Equifax Payment Services, Inc.
201 F.3d 877 (7th Cir. 2000) ................................................................................ 16

*Dean Witter Reynolds, Inc. v. Byrd*
470 U.S. 213 (1985) .............................................................................................. 23

*Eisen v. Carlisle & Jacquelin*
417 U.S. 156 (1974) .............................................................................................. 16

Foster v. Boise-Cascade, Inc.
420 F.Supp. 674 (S.D.Tex. 1976) ......................................................................... 12

*Georgine v. Amchem Products, Inc.*
83 F.3d 610 (3d Cir. 1996) ................................................................................... 20

*Grigson v. Creative Artists Agency, L.L.C.*
210 F.3d 524 (5th Cir. 2000) ................................................................................ 22

*Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*
246 F.3d 219 (2d Cir. 2001) ............................................................................ 22, 23

*In re Corrugated Container Antitrust Litigation*
643 F.2d 195 (5th Cir. 1981) ................................................................................ 12

*In re Diet Drugs*
2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ....................................................... 17

ii

*In re Ford Motor Co. Bronco II Products Litig.*
1995 WL 489480 *2 (E.D. La. 1995) ................................................................26

*In re Monumental Life Ins. Co.*
365 F.3d 408 (5th Cir. 2004) ..........................................................................15

*In re Piper Funds, Inc. Institutional Gov't Income Portfolio Litig.*
71 F.3d 298 (8th Cir. 1995) ............................................................................23

*Klay v. United Healthgroup, Inc.*
376 F.3d 1092 (11th Circ. 2004) ....................................................................25

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*
460 U.S. 1 (1983) ......................................................................................21, 23

*Phillips Petroleum Co. v. Shutts*
472 U.S. 797 (1985) .......................................................................................15

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*
388 U.S. 395 (1967) .......................................................................................22

*Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*
960 F.2d 1286 (5th Cir. 1992) ........................................................................26

*Schroeder v. City of New York*
371 U.S. 208 (1962) .......................................................................................14

*Securities Indus. Ass'n v. Connolly*
883 F.2d 1114 (1st Cir. 1989) .........................................................................22

*Shearson/American Express, Inc. v. McMahon*
482 U.S. 220 (1987) .......................................................................................24

*Southland Corp. v. Keating*
465 U.S. 1 (1984) ...........................................................................................22

*Stevenson v. Tyco Int'l*
2006 WL 2827635 (S.D.N.Y. Sept. 29, 2006) ................................................25

*Wachovia Bank, N.A. v. VCG Special Opp. Master Fund, L.L.P.*,
2010 WL 1222026 (S.D.N.Y. Mar. 29, 2010) .................................................25

*Wal-Mart Stores, Inc. v VISA USA, Inc.*
396 F.3d 96 (2d Cir. 2005) ...........................................................................6, 9

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY
APPROVAL AND BRIEF IN SUPPORT THEREOF

## Statutes

28 U.S.C. § 1292(b), (c) .................................................................................25, 25

All Writs Act, 28 U.S.C. § 1651.................................................................................23

Anti-Injunction Act, 28 U.S.C. § 2283.................................................................23, 24

Federal Arbitration Act 9 U.S.C. § 1 ..................................................................*passim*

## Other Authorities

5 Newberg on Class Actions (4th ed.).........................................................................15

Manual for Complex Litigation (2004) ................................................................16, 19

Wright, Miller & Kane, 7AA Federal Practice and Procedures: Civil 3d § 1787 ........19

## I.   **INTRODUCTION**

A group of the named plaintiffs in these consolidated class actions and the IPEX defendants (collectively the "Settling Parties") have negotiated a proposed class action settlement that would resolve the claims of an estimated 365,000[1] class members relating to the Kitec plumbing systems installed in buildings throughout the United States and Canada.  In their motion for preliminary approval, the Settling Parties have presented this Proposed Settlement for the Court's consideration and possible approval.  For the reasons set forth below, named plaintiffs Morgan and Melissa Davis, Terrence Swets, Jack Livaudais, Kenneth Hollins, and Daniel Bentz object to approval of the Proposed Settlement and request that the Court deny the pending motion.

The Proposed Settlement attempts to impose a global resolution of virtually every conceivable claim, known and unknown, relating to Kitec plumbing systems, including existing and potential claims against third parties who are not even before the Court.  The sweeping release embodied in the Proposed Settlement is breathtaking in scope.[2]  It encompasses not only claims against the IPEX defendants, who manufactured and sold Kitec, but also claims against homebuilders who would contribute *nothing* to the Proposed Settlement in exchange for an expansive release.

The Settling Parties propose to extinguish the claims of current and future homeowners against the homebuilders responsible for selecting and installing the Kitec systems, without requiring them to contribute the financial resources or critical information necessary to ensure a fair, reasonable and adequate settlement.  As a direct result of the failure to bring the

---

[1] Inexplicably, the Settling Parties have provided widely varying and inconsistent estimates of the number of class members.  Plaintiffs assume that the estimate provided to comply with Local Rule 23.2(b)(1) – 365,000 class members with 250,000 in the United States and 115,000 in Canada – is accurate.  Brief in Support of Prelim. Approval at 18 and fn. 4.  However, the Shelquist Declaration estimates the total class size at 290,000 without any explanation of the disparity.  Shelquist Decl. ¶ 13.  (Settling Parties' Appendix ["S.P. Appx."] p.3.)

[2] The release excludes *only* personal injury claims and claims predicated exclusively upon negligent installation of the Kitec system.  Proposed Settlement ¶ 93.

1

homebuilders to the table, the Proposed Settlement does not include the multi-million dollar payments that the homebuilders have made in other, directly analogous settlements involving the identical Kitec products. Indeed, in these previous Kitec settlements in Clark County, Nevada, the homebuilders collectively contributed millions of dollars *more* than IPEX– about $113 million as compared to $90 million contributed by IPEX. *See* Affidavit of Michael McKay ("McKay Aff.") ¶¶ 3, 4 (Objectors' Appx. pp. 11-12). This is particularly important because – in marked contrast to the other cases that have been successfully litigated with homebuilders as defendants – the Proposed Settlement will release the claims against the homebuilders but provide claimants with only a small portion of the actual costs to repair or replace their Kitec plumbing systems. *See* Affidavit of Andrew D. Peck ("Peck Aff.") ¶¶ 6-10 (Objectors' Appx. pp. 3-4).

The participation of the homebuilders is also necessary for an equally compelling, independent reason. The Settling Parties have neither sought nor obtained from the homebuilders the information necessary to identify the specific housing developments in which the defective Kitec products were installed. Consequently, the Proposed Settlement relies almost entirely on various proposed forms of publication to provide absent class members with notice.[3] The Settling Parties propose to conduct and complete this publication campaign in the months following preliminary approval. However, homeowners will have eight years to submit a claim. It is highly unlikely that anyone will recall the advertisements or remember how to obtain a claim form years after the notice program is completed.

In any event, the broad brush, generalized approach to class notice envisioned by the Proposed Settlement is highly unlikely to induce individual homeowners, who lack knowledge or information about whether Kitec was installed in their homes, to undertake the multiple-step process necessary even to obtain the form required to make a claim. As the Settling Parties

---

[3] In addition to publication, the notice program would consist of "earned media through a press release," "electronic notice through a website," and very limited mailing. Hanson Decl. ¶ 9. (S.P. Appx. p. 190.)

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

recognize, virtually all of the Kitec plumbing fixtures in the homes of class members are installed behind drywall or embedded in concrete and their presence cannot easily be verified by class members even if they happen to be exposed to an advertisement relating to the Proposed Settlement.[4]  Given these obstacles, it is inevitable that only a small percentage of the class will undertake the onerous claims process and provide the sensitive personal information necessary to submit a claim.  Under the circumstances, the proposed method of class notice is inadequate and should not be approved.

Nor are these troubling defects in the Proposed Settlement ameliorated by the inclusion of an opt-out process.  As a practical matter, the reliance on publication as the principal mechanism for providing class notice renders the opt-out option largely illusory and entirely inadequate to protect the Due Process rights of absent class members in this case.  Under the Proposed Settlement, class members must obtain, complete and return a specific Opt Out Form in order to avoid the res judicata effect of the settlement.  However, the parties do not plan to mail the Opt Out Form to most class members.  Indeed, the notice plan assumes that the Long Form Class Notice and Opt Out Form will be sent to less than .003% of the class.  (*See* Hanson Declaration [S.P. Appx. p. 187] summarizing notice plan as including mailing to approximately 1,000 potential class members with known addresses and an additional 15,000 addresses of associations and companies.)  All other class members would have to affirmatively seek out and obtain the Opt Out Form, if they happen to learn of the Proposed Settlement, to exercise their constitutionally protected Due Process rights.  More important, even those class members who are exposed to advertisements about an obscure plumbing product that they are unfamiliar with, and that they cannot easily access behind the drywall or concrete in their homes, will not undertake the investigation necessary to ascertain the opt-out process or obtain the required Opt

---

[4] The Plan of Distribution estimates that only "approximately 5% of the installations will be open and accessible." POD, S.P. Appx. p. 101.  The other 95% are behind drywall (94%) or embedded in concrete (1%).  *Id.*

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

Out Form, much less exercise their right to opt out. They simply will not perceive any need to do so.

These significant problems are further exacerbated by the abbreviated opt-out period in the Proposed Settlement. Although class members have eight years to submit clams, they have only 60 days from the initial publication of notice to exercise their right to opt out. Proposed Settlement ¶ 82. In providing a lengthy claims period, the Settling Parties have acknowledged that this litigation involves latent defects which most absent class members are currently unaware of and which might not become manifest until as late as 2019. Nevertheless, the Proposed Settlement would compel homeowners to opt out by mid-2011. This requirement violates the Due Process rights of absent class members and should not be approved by the Court. Class members must be afforded a second opportunity to opt out when the defects manifest themselves, or the opt-out period should be co-extensive with the claims period.

Moreover, the Opt Out Form itself constitutes an additional obstacle in the process. In order to opt out, a class member must obtain, complete and return a specific two-page form. The form is unduly complicated and burdensome to complete. Among other things, this form requires an individual to disclose whether he "has entered into a written or oral agreement to be represented by counsel regarding [his] Kitec System," in which case the form is supposed to be signed by the attorney. Opt Out Form, S.P. Appx. p. 107. This added burden is unjustified by any countervailing considerations.

All of these flaws in the Proposed Settlement are compounded by the provisions authorizing the Court to enjoin putative class members from proceeding with contractually authorized arbitrations and existing litigation against homebuilders. The Proposed Settlement provides for an injunction against any class member proceeding with any released claim, whether in arbitration or in a judicial proceeding. Proposed Settlement ¶ 67(g). As demonstrated below, the Court should not enjoin existing litigation against homebuilders and should decline to approve this aspect of the Proposed Settlement. Alternatively, the Court should certify this issue

under 28 U.S.C. § 1292(b) to facilitate an interlocutory appeal to the Fifth Circuit and hold all further proceedings in this matter in abeyance until the Court of Appeals addresses it.

## II.   ARGUMENT

### A.   The Release Is Overbroad Because It Includes Claims Against The Homebuilders

The Settling Parties propose to release not only the IPEX defendants, but also the homebuilders who selected and installed the Kitec fittings and are responsible for the damages sustained by the class. This sweeping release – which is unsupported by *any* consideration from the released third parties – is prejudicial to the class and entirely unjustified by the circumstances of this case.

The release – which the Proposed Settlement states shall be construed as "broad and expansive" (Proposed Settlement ¶¶ 90, 91) – provides:

> [A]ll Settlement Class Members, and any Person who participates in or receives any payment from the Settlement Fund, … release and forever discharge… each of the IPEX Defendants and the IPEX Funding Entities …, and any IPEX sales agents and distributors; *each of the wholesalers, retailers, plumbers, home builders, contractors, engineers, architects, and any other product or service provider who purchased, advised, recommended, sold, and/or installed the Kitec System*, and [all related parties]… from each and every claim of liability, on any legal or equitable ground whatsoever,…regarding or related to the Kitec System … which were alleged or could have been alleged in the Complaints in [the consolidated actions].

Proposed Settlement ¶ 89 [emphasis added]. The sole exceptions to this global release are (1) personal injury claims (Proposed Settlement ¶ 90), (2) claims against "suppliers of raw materials, components or ingredients used in the manufacture of the Kitec System," which the settlement class members assign to IPEX (Proposed Settlement ¶ 89),[5] and (3) claims predicated solely on the improper installation of the system. Proposed Settlement ¶ 93. The stated intent of the release provisions is "that no Releasing Party shall recover, directly or indirectly, any sums for claims released by operation of this Agreement, including, without limitation to the claims

---

[5] In reality, this "assignment" renders the "exception" meaningless.

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

settled and released herein from the Released Parties, other than sums received under this Agreement...." Proposed Settlement ¶ 92.

The Court must decide whether the scope of the release is fair as part of its overall assessment of the reasonableness of the Proposed Settlement. *See Wal-Mart Stores, Inc. v VISA USA, Inc.*, 396 F.3d 96, 109 (2d Cir. 2005). The extremely broad release – which is very likely to go unnoticed even by those few class members who are able to obtain and make their way through the long-form class notice – has a number of serious repercussions that will be detrimental to the class. The release should not be approved by the Court because:

- it would wipe out several pending actions and completely exonerates the third party defendants in those actions from any liability for their wrongful actions;

- it would deprive class members of a significant source of additional funding that could make them whole for their losses; and

- it would leave the parties with no effective way to identify the individual class members and provide them with class notice apart from publication of the Proposed Settlement.

Each of these impacts is sufficient to warrant rejection of the Proposed Settlement.

### 1.      Pending actions raise valuable claims against the homebuilders.

The Settling Parties have not disclosed the number of individual and class actions pending against third parties that would be brought to a halt and terminated by the Proposed Settlement. At a minimum, however, the Proposed Settlement would wipe out the following pending class actions:[6]

- ***Davis, et al. v. McGuyer Homebuilders, Inc., Plantation Homes, and Pioneer Homes.*** The *Davis* plaintiffs filed this action in the Travis County, Texas Judicial District on May 12, 2010, on behalf of "all persons, trusts, corporations, partnerships, associations, and/or entities in the State of Texas that own single family homes

---

[6] The facts regarding the status of the actions are set forth in the supporting affidavit of plaintiffs' counsel Michael McKay, ¶ 6 (Objectors' Appx. pp.12-13).

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

constructed by Defendants in which Kitec is installed." The complaint includes claims for product liability, breach of express warranty, breach of implied warranty, and negligence. On June 18, 2010, before answering, McGuyer Homebuilders, Inc. ("MHI") moved to compel arbitration. The plaintiffs did not challenge the validity of the arbitration provisions in question and agreed to arbitrate their claims. MHI subsequently brought Falcon Plumbing and Construction, Inc. ("Falcon"), the subcontractor who installed plaintiffs' defective Kitec systems, into the case. Falcon then sued IPEX, who removed the action. On November 19, 2010, the case was transferred into the MDL for pretrial proceedings.

- ***Swets, et al. v. PulteGroup, Inc.; Del Webb Texas Limited Partnership***. The *Swets* plaintiffs initially filed their class action complaint against Pulte Homes, Inc. in the United States District Court for the Eastern District of Michigan (where Pulte is headquartered) on May 14, 2010. The case was dismissed by mutual agreement and plaintiffs initiated an arbitration proceeding pursuant to their contract with Del Webb Texas. However, due to a disagreement over the arbitral forum, plaintiffs later refiled in the District of Arizona (the domicile of Del Webb). Plaintiffs allege products liability, breach of express warranty, breach of implied warranty, and negligence claims on behalf of "all persons, trusts, corporations, partnerships, associations, and/or entities in the State of Texas that own single family homes constructed by Defendants in which Kitec plumbing fittings are installed." The case was transferred into this MDL proceeding last November.

- ***Mortensen v. Highland Homes***. Tim Mortenson filed this action in the Travis County, Texas Judicial District on May 10, 2010, on behalf of "all persons, trusts, corporations, partnerships, associations, and/or entities in the State of Texas that own single family homes constructed by Defendants in which Kitec is installed." The

complaint includes claims for product liability, breach of express warranty, breach of implied warranty, and negligence. *Mortensen* is proceeding in Texas State Court.

- **Thompson v. Lennar Corporation; Lennar Homes, LLC; Lennar Homes of Texas, Inc.; Lennar Homes of Texas Land and Construction Ltd.; Lennar Homes of Texas Sales and Marketing Ltd.; and Lennar Houston Land LLC.** The *Thompson* case was filed in the United States District Court for the Southern District of Florida (where Lennar is headquartered) on May 6, 2010, on behalf of "all persons, trusts, corporations, partnerships, associations, and/or entities in the State of Texas that own single family homes constructed by Defendants in which Kitec is installed." The case is being arbitrated under the AAA rules in Texas.

The claims against the homebuilders in these cases include distinct claims beyond the defective product claims asserted against IPEX, including, for example, negligence by homebuilders in selecting or approving the installation of Kitec plumbing components; breach of express warranty; breach of implied warranty; statutory right of repair obligations; and other statutory provisions (such as the Texas Residential Construction Liability Act, Tex. Prop. Code §27.001 *et seq.*) that pertain only to licensed contractors. Under the Proposed Settlement, all of such claims would be released without any consideration from the builders.

Neither the brief in support of preliminary approval nor the supporting declaration of the settling plaintiffs' counsel Robert Shelquist provides any indication that the Settling Parties gave any consideration to the value of the homebuilder claims. Similarly, they do not include any explanation of why it would be reasonable to require class members to release their claims against the homebuilders in order to obtain compensation from IPEX. Moreover, nothing suggests that the homebuilders were brought to the negotiating table or that any effort was made to obtain any level of consideration from them. This failure – especially when contrasted with the previous settlements involving Kitec products, discussed below – strongly militates against approval of the Proposed Settlement. *See Wal-Mart Stores*, *supra*, 396 F.3d at 109 ("A

determination that all of the settled claims arose from the same factual predicate does not necessarily end the inquiry. Claims arising from a shared set of facts will not be precluded where class plaintiffs have not adequately represented the interests of class members.")

**2.   Previous actions against homebuilders have produced multi-million dollar recoveries.**

One of the factors that the Court should consider in evaluating a class action settlement that releases nonparties is whether they contributed to the settlement. *Wal-Mart Stores*, *supra*. In *Wal-Mart Stores,* a group of plaintiffs objected to the settlement of a class action brought by a group of merchants against Visa and MasterCard alleging that defendants' "Honor All Cards" policy forced the merchants to agree to unreasonably high transaction fees on debit card transactions in order for them to be able to accept payment on Visa and MasterCard credit cards, thus violating anti-tying laws. The objectors challenged the settlement on the ground the release improperly barred their claims against certain member banks (the issuers of the cards), who were not parties to the litigation. The Court of Appeal affirmed the order approving the settlement, in large part because "the banks not only contributed to the Settlement but virtually all of the relief comes from them. [Internal quotation marks omitted.]" *Id.*, 396 F.3d at 109.

That is decidedly *not* the case here. In contrast to the very substantial contribution the homebuilder defendants have made in previous litigation over the identical claims, the builders here would contribute nothing whatsoever to the Proposed Settlement. In April 2006 a group of Nevada homeowners commenced a class action, *Quintero v. IPEX, USA,* over the defective Kitec fittings installed in homes in Clark County, Nevada (the "Nevada Action"). The Nevada Action included claims against both the manufacturer of the fittings (IPEX), and the various homebuilders who constructed the homes with the defective fittings and certain plumbing contractors. The court certified the matter as a class action against both IPEX and the homebuilders. McKay Aff. ¶ 2 and Exh. A, (Objectors' Appx. pp. 10, 15-17). The case subsequently settled, with some 30 builders and contractors contributing $113 million to the class and subclass settlement funds. *Id.* ¶ 3. The $113 million paid in settlement of the claims

9

against the homebuilders in fact *exceeded* the settlement fund created on behalf of IPEX, which was $90 million. *Ibid.* The Nevada settlements ranged from $12 million (KB Homes, 3,049 homes) to $116,000 (Vipor Homes, 58 homes). *Id.* ¶ *Ibid; see also* Class Action Settlement Notices, McKay Aff. Exh. B (Objectors' Appx. p.19-251); www.plumbingdefect.com/caseupdates (last visited April 12, 2011).

In contrast to those settlements, which benefited about 30,000 homeowners in a single Nevada County, the Proposed Settlement here purports to resolve the claims of 365,000 homeowners throughout the United States and Canada for a total of $100 million,[7] with nothing being contributed on behalf of the homebuilders. The proposed summary disposition of the class's builder claims, which are virtually indistinguishable from the Nevada claims, is entirely unjustified.

3.  **As a result of the failure to bring the homebuilders to the table, the Proposed Settlement and release would deprive the class of the opportunity to be made whole.**

The Settling Parties' failure to bring the homebuilders to the table prejudices class members because it will deprive them of the opportunity to be made whole for the losses caused by the Kitec plumbing systems. In the proposed Plan of Distribution ("POD," [S.P. Appx. p. 79ff]), the Settling Parties estimate that 30% of class members will submit a claim form (S.P. Appx. p. 100). They assume an average repair cost for Kitec leaks of $225 (open access – 5% of claims), $575 (behind drywall – 94% of claims), or $850 (pipes installed in concrete - 1% of claims). On the basis of these assumptions, the Settling Parties conclude that the Proposed Settlement will be sufficient to provide claimants reimbursement of 50% of their damages. *Ibid.*

As discussed below, the assumptions on which this calculation is based are highly suspect; but even assuming they were realistic, that still leaves even those class members who successfully navigate the claims process uncompensated for a significant portion of their damages. Further, compensation is only available to class members who "can substantiate a

_____

[7] The Proposed Settlement includes a separate fund of $25 million for attorneys' fees but this amount is not available for class member relief. Proposed Settlement ¶ 100.

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

qualified leak in their Kitec system." *Ibid. The term "qualified leak" is not defined in the Proposed Settlement or in the Plan of Distribution.* However, it would appear to leave out damages related to decreased water pressure from the dezincification and subsequent calcification of the pipe, a common problem caused by the defective Kitec fittings.

To evaluate the adequacy of the compensation provided by the Proposed Settlement, objecting plaintiffs have retained Andrew Peck, the Vice President of the largest plumbing company in the United States (Delta Mechanical), as their expert on these issues, and submit his Affidavit herewith.  (Objectors' Appx. p.2.)  Delta Mechanical was, in fact, one of the court-appointed plumbers in the Nevada Action, and it performed over 4,000 "repipes" for class members in connection with previous Kitec settlements.  Peck Aff.  ¶¶ 1, 2.  Mr. Peck has reviewed the compensation provisions of the Proposed Settlement and avers that the estimated repair costs on which the compensation is based ($225 for the few open and accessible fittings, $575 for the estimated 94% of fittings located behind drywall, and $950 for the fittings installed in concrete) are unreasonably low when compared to what Delta Mechanical and other plumbers in the industry would charge for the work. *Id.* ¶¶ 4-6.  "Based on my knowledge and experience," Peck avers that "a fair and reasonable estimate to replace all Kitec in a typical home with 15 water fixtures is, including building permit. $7,500." Peck Aff. ¶ 7.[8]

Peck's experience is that a truly "fair and reasonable estimate" to replace a single fitting that is "open and accessible" is $350; to replace a fitting behind drywall is $550-675; and to replace a fitting in concrete is $1,450. *Id.* ¶¶ 8-10.  He also explains that:

> [I]n addition to replacement or repair based on leaks, Kitec plumbing also experiences other problems that require a repair or replacement.  For example, pipes that do not leak may still be unsuitable because a process known as dezincification reduces water flow and water pressure in homes with Kitec fittings.  Among other things, reduced water flow and water pressure may render certain appliances unusable, or inefficient.

---

[8] In contrast, the POD (S.P. Appx. p. 100.) represents, without explanation, that "two qualified leaks per home is the likely maximum."

*Id.* ¶ 12.  The Proposed Settlement, which limits compensation to "qualified leaks," appears to offer no compensation for such repairs.

The Settling Parties, who bear the burden on this issue, offer no justification for why the homebuilders, who are already embroiled in litigation over these issues, should not contribute *any* resources to fill these compensation gaps.  *See Foster v. Boise-Cascade, Inc.,* 420 F.Supp. 674, 680 (S.D.Tex. 1976), *aff'd,* 577 F.2d 335 (5th Cir.1978) ("The burden should be placed on the parties, especially the class representative, to prove to the district court and class members that the recommended compromise and all of its components are fair, reasonable and adequate.") "Mere boiler-plate [advocacy] phrased in appropriate language but unsupported by evaluation of facts or analysis of the law" is insufficient.  *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 212 (5th Cir. 1981).

In comparison, the 2009 Nevada settlement with Del Webb resolved the claims of 6,617 homeowners for a benefit of about $3,560 per class member.  When added to the compensation separately promised by IPEX to those same homeowners, class members in that case would receive benefits of $9,100 per homeowner.  (McKay Aff. ¶5 (Objectors' Appx. p.3.)

**B.    The Court Should Refuse to Approve the Settlement Because, As a Result of the Failure to Bring the Homebuilders to the Table, the Settling Parties Lack Valuable Information That Would Enable Them to Provide Individualized Notice to the Class**

The exoneration of the homebuilders also results in the Settling Parties being unable to give "the best notice practicable" to the class, causing the Proposed Settlement to fail to comply with due process.  "[T]raditional due process standards require that the notice be one reasonably calculated to apprise members of the class of their opportunity to object or to 'opt out' rather than be bound by the determination of the class action...."  *Berland v. Mach*, 48 F.R.D. 121, 129 (S.D.N.Y. 1969), citing *Mullane v Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). The preferred form of class notice is first class mail. *Mullane*, 339 U.S. at 313 ("Personal service of written notice within the jurisdiction is the classic form of notice always adequate in any type of proceeding.").

The Proposed Settlement (¶¶ 70-81) provides for notice by publication in various media and on the Internet, through press releases, and by the mailing of a long form notice to "each settlement Class Member who can be reasonably identified." The notice plan indicates that the Settling Parties have identified only approximately 1,000 potential class members, which is less than .003% of the 365,000 class members. Hansen Decl. ¶ 11 (S.P. Appx. p. 191). The Proposed Settlement does not, however, impose *any obligation* on the IPEX defendants (or anyone else) to do anything to attempt to identify or locate addresses for absent class members. Indeed, "the IPEX Defendants have informed Class Counsel that they do not maintain data specifying Class Members' names and addresses" and are only obligated to make "reasonable efforts" to provide "reasonably available data, if any, specifying Class Members' names, addresses, and other contact information." Proposed Settlement ¶ 72. The Settling Parties have entirely overlooked the fact that actions against the homebuilders provide a potent tool for identifying the addresses of absent members of the class: the homebuilders' records identify the specific locations and addresses of the homes in which Kitec plumbing systems were installed, enabling individual mailed notice to be sent.

This failure is, again, in marked contrast to what occurred in the previous litigation over Kitec fittings. In its Order Granting Motion to Certify Class in the Nevada Action (Objectors' Appx. p.16), the District Court directed the contractor defendants "to promptly disclose to Class Plaintiffs the names and addresses of all subdivisions and homes where brass Kitec Fittings have been installed." There is no reason why a similar provision, requiring any party wishing to take advantage of the release to fully disclose the addresses where Kitec was installed, could not be included in the Proposed Settlement here.

While notice by publication is appropriate where the names and addresses of the intended recipients are unknown, as to known individuals, "notice by publication stands on a different footing. Exceptions in the name of necessity do not sweep away the rule that within the limits of practicability notice must be such as is reasonably calculated to reach interested parties. Where

13

the names and post office addresses of those affected by a proceeding are at hand, the reasons disappear for resort to means less likely than the mails to apprise them of its pendency." *Mullane* at 318.  *See also Schroeder v. City of New York*, 371 U.S. 208, 212-13 (1962) ("The general rule that emerges from the *Mullane* case is that notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable and whose legally protected interests are directly affected by the proceedings in question.").

The absence of any mechanism for the identification of the hundreds of thousands of class members is likely to significantly erode the benefits promised by the Proposed Settlement, and result in a large reversion of funds to IPEX.  Proposed Settlement ¶ 110 (requiring repayment of all unclaimed funds to IPEX defendants).[9]  The average homeowner, unless he has already experienced and paid to repair a "qualified leak," is likely to be ignorant of the brand of pipe fittings behind his or her walls and cannot determine that information without a destructive and costly inspection.  In contrast, the builders and contractors who installed the plumbing have records which would reveal where the defective Kitec fittings were installed.  The potential contribution of this critical demographic information by the homebuilders is a valuable asset which the Settling Parties appear completely to have ignored, and that the Court should consider in determining whether the Proposed Settlement should be approved.

Mailed notice to such households, on the basis of information supplied by the homebuilders, would ensure that affected class members get actual notice of the Proposed Settlement, greatly increase the likelihood that they would (knowing they have Kitec fittings in their home) submit a claim form, and enable them to evaluate whether to opt out of the Proposed Settlement.  Under these circumstances – where information enabling the parties to identify absent class members is available, and the failure to send individualized notice is likely to prevent tens of thousands of class members from receiving actual notice of their rights – the

---

[9] In *Mullane*, the Supreme Court noted that "It would be idle to pretend that publication alone as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts." 339 U.S. at 315.

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

proposed publication campaign is not "the best practicable" notice to the class, and does not

provide the "minimal procedural due process protection" necessary to bind absent class members.

*See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

C. **The Court Should Refuse To Approve the Settlement Because The Opt Out Procedures Are Inadequate To Protect The Due Process Rights of Absent Class Members**

Due process also requires "at a minimum that an absent plaintiff be provided with an

opportunity to remove himself from the class by executing and returning an 'opt out' or 'request

for exclusion' form to the court." *Shutts*, 472 U.S. at 812. "The opt-out provision is

constitutional and required as a matter of due process in class actions for money damages." 5

Newberg on Class Actions (4th ed.) §16:15 p. 198-99, citing *Shutts*. The right to opt out of a

class action settlement is, in fact, one of the "fundamental requisites of the constitutional

guarantees of procedural due process." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416 (5th

Cir. 2004) (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174 (1974).) A meaningful

opportunity to opt out of a class action settlement is, therefore, mandatory for damage classes,

such as this one, to be certified under Rule 23(b)(3). *Ibid.*; *see also Crawford v. Equifax*

*Payment Services, Inc.*, 201 F.3d 877, 882 (7th Cir. 2000) ("Recognition that notice and an

opportunity to opt out are vital to most representative actions for damages is of long standing.");

*Carlough v. Amchem Products, Inc.*, 10 F.3d 189, 201 (3d Cir. 1993) ("Strictly and narrowly

enforcing the requisite opportunity to opt out for Rule 23 class plaintiffs before exerting personal

jurisdiction comports with the overall class action mechanism and is derived from policy

considerations bearing upon comity and federalism.")

The opt-out option in the Proposed Settlement fails to satisfy due process because it is

illusory rather than meaningful. *See Mullane*, 339 U.S. at 315 ("[W]hen notice is a person's due,

process which is a mere gesture is not due process. The means employed must be such as one

desirous of actually informing the absentee might reasonably adopt to accomplish it."). In

addition to myriad problems with the Opt Out Form, discussed below, the most significant defect

in the proposed opt out process is that while class members have *eight years* to submit a claim, they have only *60 days* from the date of initial publication of the notice to complete the complex opt-out process. This means that homeowners who have not yet experienced any problems with their Kitec plumbing systems have to decide whether to opt out before they even know whether they are in the class (before they have the occasion to determine what type of pipe fittings they have), and before they have suffered a "qualified leak," whatever that means.

Especially when evaluated in the context of the fact that class members will not receive individual mailed notice, the short opt-out period renders the opt-out procedure, and thus the entire Proposed Settlement, inadequate. The Settling Parties recognize that defects in the Kitec system will manifest themselves years in the future. This is why the Proposed Settlement provides an eight-year claim period. Where class members are, as here, likely to be unaware of the facts entitling them to relief until some point in the future, the right to opt out is "illusory…unless [the absent class members] are protected by 'back-end opt out' rights that permit individuals to decide whether to remain in the class after they become aware that they are injured, may have a claim, and understand the severity of their injury." Manual for Complex Litigation (2004) ("Manual"), § 21.612 at 314; *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 628 (1997) (finding initial opt-out right to not be meaningful because some asymptomatic class members were unaware that they were even exposed to asbestos).

To cure this defect, the Proposed Settlement should either provide for an opt-out period that is coextensive with the claims period, or at least provide for an intermediate opt-out period that would run from the time that the defect manifests itself by causing discernible harm. *In re Diet Drugs*, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000), provides an example of how such an intermediate opt-out period can be structured. In *Diet Drugs,* the parties were faced with a similar situation in which many class members' injuries would not become manifest until well after the settlement was finalized. The settlement provided that if a class member learned s/he had a covered medical condition within the specified period, the individual had the right to opt

16

out of the settlement and pursue a claim for compensatory damages in the tort system without meeting the bar of the statute of limitations or similar defenses.  2000 WL 1222042 at *39.  The court found the settlement to be fair because the "intermediate and back-end opt out rights allow class members to make informed choices about whether to remain in or opt out of the settlement."  *Ibid.*

The settlement before the Court contains no such protections.  Rather, class members are provided a single 60-day window in which to decide whether to opt out of the class, without the benefit of having any knowledge about their membership in the class or the manifestation of a defect.  The opt-out procedures should not be approved by the Court.  *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007) (denying preliminary approval of class action settlement on the ground, *inter alia*, that the cut off dates used to determine eligibility for relief were "arbitrary and bear no relationship to the procedural or substantive limitations on the class members' claims," and because as to some class members, the settlement "would absolve them of all possible claims unless they have both the good fortune to receive notice of the Settlement and the sagacity to take affirmative opt out action in order to protect claims of which they may be unaware.").

In addition to the unreasonably short opt-out period, there are multiple other, fundamental defects in the proposed opt-out procedure.

1.      Unlike the typical provision advising class members who wish to opt out of a settlement to send a short statement to class counsel or the settlement administrator that simply references the name of the case, gives their name and address, and states that they wish to opt out, class members here would be told that, "You cannot opt out without properly and timely completing this required form."  Opt Out Form, S.P. Appx. p. 103 ff.

2.      Under the proposed notice plan, however, the Long Form Settlement Notice that includes the required Opt Out Form will be mailed to less than .003% of class members. Everyone else who has not yet experienced a "qualified leak" must first figure out whether they

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

are in the class – *i.e.*, engage in a destructive inspection in order to confirm whether there are Kitec pipe fittings behind their walls – and then download or request that the Opt Out Form be mailed to them.

3.       The two-page Opt Out Form includes complex questions that many class members will have no idea how to answer.  For example, the "Property Information" section asks, "Do you have or believe you may have the right to pursue a claim through or in the name or right of someone who currently or at any time in the past has owned or leased property(ies) that may contain the Kitec System?"  It also demands that class members state the size of their property in square feet or meters.

4.       To opt out of the Proposed Settlement, class members must disclose whether they have "entered into a written or oral agreement to be represented by counsel regarding your Kitec System?", and they must disclose the name and address of their attorney.  This is followed by a line for the attorney's signature.  (S.P. Appx. p. 107)  It thus appears that a class member who seeks legal advice regarding whether to opt out not only has to disclose that fact to the Settling Parties, but also must undertake the additional step of having his or her attorney sign the Opt Out Form.  These intrusive provisions invade the attorney-client privilege and may well discourage, rather than encourage, class members to seek legal advice about whether to participate in the Proposed Settlement – precisely the opposite of what should be done.   In any event, the process creates an additional, time-consuming step that will create a burden on class members, as well as those attorneys representing individual class members – most especially those lawyers who must learn for the first time about the claims released in the Proposed Settlement before offering legal advice.

5.       A class member's failure or understandable inability to respond to every one of the questions on the Opt Out Form purportedly renders their opt out ineffective.  Proposed Settlement ¶ 82 [opt out form must be completed "in its entirety".]  The Opt Out Form warns:

> UNLESS YOU PROPERLY COMPLETE AND RETURN THIS OPT OUT
> FORM, YOU WILL BE BOUND BY ANY JUDGMENT IN THE

LITIGATION AND YOU WILL NOT BE PERMITTED TO PURSUE ANY
PENDING OR FUTURE LITIGATION ON MATTERS RESOLVED IN THIS
SETTLEMENT.

There is no justification for any of these onerous requirements and burdensome opt-out

process. They "raise[ ] serious fairness concerns." *Georgine v. Amchem Products, Inc.*, 83 F.3d

610, 633 (3d Cir. 1996), *aff'd sub nom. Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)

(declining to approve class action settlement where, without individualized notice of the facts,

"some plaintiffs would be bound despite a complete lack of knowledge of the existence or terms

of the class action."). As the Manual for Complex Litigation cautions, "[t]he opt-out procedure

should be simple." Manual § 23.321 at 298. "[C]onsiderable flexibility is desirable in

determining what constitutes an effective expression of a class member's desire to be excluded

[footnote] *and any written evidence of that desire should suffice*." Wright, Miller & Kane, 7AA

Federal Practice and Procedures: Civil 3d § 1787 at 520 (emphasis added).

> **D.    The Court Should Refuse To Approve The Proposed Settlement Because It
> Unfairly Seeks To Deprive Class Members Of Their Right To Arbitrate
> Their Claims Against The Homebuilders, And To Enjoin Ongoing
> Proceedings**

The Proposed Settlement requires that the preliminary approval order include a provision

"enjoining settlement class members from commencing or prosecuting any action asserting any

claims that re the subject of the Releases." Proposed Settlement ¶67(g). The Court should

decline to approve the Proposed Settlement because the requested injunction would unfairly

deprive class members of their right to arbitrate their claims against homebuilders, and would

interfere with both the ongoing arbitration proceedings in *Thompson*, the state court proceedings

in *Mortenson*, and potentially other ongoing proceedings against the homebuilders of which

objectors are not aware. The injunction against the arbitration proceedings would be contrary to

the language and purposes of the Federal Arbitration Act ("FAA," 9 U.S.C. § 1 *et seq.*), while

the injunction against the state court proceedings would be contrary to the policies underlying the

Anti-Injunction Act (28 U.S.C. § 2283). There is no justification for depriving homeowners of

their right to seek redress from the homebuilders responsible for incorporating defective

plumbing products into their homes, or of their right to have such claims determined through arbitration and state court proceedings.

      **1.**    **The proposed injunction against completion of ongoing arbitration proceedings would frustrate the intent of the contracting parties and would be contrary to the Federal Arbitration Act.**

The purchase and sale contracts for new home construction frequently include arbitration clauses. For example, Chad and Sarah Thompson's contract with Lennar Homes of Texas provides: "The parties to this Agreement specifically agree that any dispute (whether contract, warranty, tort, statutory or otherwise), …, shall first be submitted to mediation and, if not settled during mediation, shall thereafter be submitted to binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. §§1 et seq.) and not by or in a court of law." *See* Purchase and Sale Agreement ¶ 20.1, FLSD Docket, Case 1:10-cv-21480-JLK, ECF Doc. No. 13, 13-2. Similar arbitration agreements exist between, *inter alia*, McGuyer Homebuilders, Inc. ("MHI") and the plaintiffs in the *Davis* action; and Pulte/Del Webb and the plaintiffs in *Swets*. The homeowners made arbitration demands in all three of the cases, and arbitration proceedings are underway in *Thompson*. *See* McKay Aff. ¶6 (Objectors' Appx. pp.12-13).

      It is well-settled that the courts must enforce such arbitration agreements unless grounds exist at law or in equity to revoke or void the agreement. Section 2 of the FAA provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." The United States Supreme Court has repeatedly construed that language as "a congressional declaration of a liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983); *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984) (the FAA reflects "a national policy favoring arbitration"), and that policy has been echoed by courts around the country including the Fifth Circuit. *See, e.g., Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 526 (5th Cir. 2000) ("Arbitration is favored in the law."); *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) ("There is a strong federal policy

favoring arbitration as an alternative means of dispute resolution."); *Securities Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1118 (1st Cir. 1989) (The FAA reflects Congress's "unmistakably clear ... purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction." [quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)].) No party has challenged the validity of the arbitration clauses in any of the actions relevant here, or questioned their applicability to the claims asserted against the builders.

Whereas the usual rule is that "proceedings against parties and non-parties to the arbitration agreement are stayed pending the outcome of arbitration," *Grigson*, 210 F.3d at 526, *see generally* 9 U.S.C. § 3 (providing for stay of court proceedings where issues are referable to arbitration), here the Proposed Settlement not only stays but purports to do away with class members' arbitrable claims without regard to the value of those claims. Under these circumstances, there is no cause for the Court to enjoin the ongoing or potential future arbitrations between class members and the homebuilders, particularly because the class members will receive *nothing* from the homebuilders in exchange for their release of these valid claims.

Although it is true that a single class action settlement may in some cases be a more efficient way of proceeding, an interest in efficiency does not by itself trump the reach of the FAA. *See Hartford Accident & Indem.*, 246 F.3d at 226; *Moses H. Cone Mem. Hosp.*, 460 U.S. at 20 ("[T]he relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement." [emphasis in original]); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985) ("[T]he Arbitration Act requires district courts to compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.").

An analogous case on this issue is *In re Piper Funds, Inc. Institutional Gov't Income Portfolio Litig.*, 71 F.3d 298 (8th Cir. 1995), in which the Eighth Circuit held that a district court

had "violated the FAA and abused its discretion when it enjoined [an investor] from arbitrating its claims." Investor Park Nicollet had filed a Statement of Claim for arbitration of its securities fraud claims against Piper Funds after a securities class action had been filed, but before a class had been certified or settlement reached. When the parties to the class action subsequently reached a settlement, Park Nicollet advised the court that it wished to opt out of the class and proceed with the arbitration. The district court nevertheless issued an order enjoining the arbitration pending future court proceedings. Park Nicollet moved to vacate the order and to stay the class actions pending the completion of arbitration. The district court denied the motion and the investor appealed.

Framing the question as "whether an unwilling class member's right to arbitrate may be held hostage … to the class action settlement process," 71 F.3d at 304, the Court answered with a resounding "NO." First, the Court held that "*McMahon* [10] confirmed that Park Nicollet has a contractual right to immediate submission of its securities law claims to arbitration" and that "the district court's injunction significantly frustrated Park Nicollet's contractual rights, as protected by the FAA." *Id.* at 303. Second, it held that "prior cases make clear that [the investor's] contractual and statutory right to arbitrate may not be sacrificed on the altar of efficient class action management." *Ibid.* Third, it rejected the class action parties' "conclusory assertion that immediate arbitration by Park Nicollet (and perhaps others) will frustrate their class action settlement." *Ibid.* The Court of Appeals concluded that Park Nicollet should have been allowed to opt out of the class as it requested, and proceed with the arbitration of its claims.

The principles of the *Piper Funds* case are applicable here. The Thompsons commenced their arbitration proceeding prior to the time that the proposed settlement was announced, and there is no reason why their claims against the builders – non-parties to the class action under consideration – should be barred.

---

[10] The Court was referencing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987).

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF

Any assertion by the Settling Parties that the Court should enjoin the arbitration proceeding pursuant to the All Writs Act, 28 U.S.C. § 1651, should likewise be rejected. As IPEX itself argued in its opposition to MHI's motion to compel arbitration (ECF Doc. No. 19), a court may grant an injunction under the All Writs Act only when the injunction is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it...." *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Circ. 2004), quoting *Adams v. United States*, 317 U.S. 269, 273 (1942). Here, the proposed injunction would hurt the interests of the class members who this Court is bound to protect, by decreasing rather than adding to the funds available to compensate them.

Further, those cases that have considered the issue have generally concluded that the All Writs Act must yield to the FAA. In *Stevenson v. Tyco Int'l*, 2006 WL 2827635 (S.D.N.Y. Sept. 29, 2006) at *9, for example, the Court held:

> [T]here are limits to a court's authority under the All Writs Act. For example, courts cannot use the All Writs Act to justify the use of injunctions or commands where a statute [such as the FAA] specifically addresses the particular issue in dispute. * * * It is clear ... that a court may use the All Writs Act to prevent arbitrators from deciding issues within the court's jurisdiction. However, the FAA divests the courts of jurisdiction where the parties properly request arbitration.

*See also Wachovia Bank, N.A. v. VCG Special Opp. Master Fund, L.L.P.*, 08-5655, 2010 WL 1222026 (S.D.N.Y. Mar. 29, 2010) ("The court's power to enjoin arbitration under the All Writs Act can only be exercised if the court first determines that the parties have not agreed to submit a particular question to arbitration."). Here, the Thompson plaintiffs have properly requested arbitration, and arbitration is proceeding (with the defendants' acquiescence). The All Writs Act should not be used to thwart the parties' legitimate right to arbitrate those pending claims.

### 2. The proposed injunction against the ongoing state court proceedings should not be approved because it is contrary to the Anti-Injunction Act.

Just as the FAA requires courts to defer to contractual arbitration agreements, the Anti-Injunction Act limits federal courts' authority to enjoin parallel state court proceedings except in

limited circumstances.  The Act exempts state court proceedings from federal intervention "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.  Courts interpret the "in aid of jurisdiction" exception narrowly, finding a federal court's jurisdiction threatened "only where a state proceeding threatens to dispose of property that forms the basis for federal *in rem* jurisdiction, or where the state proceeding threatens the continuing superintendence by a federal court, such as in a school desegregation case." *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 960 F.2d 1286, 1298 (5th Cir. 1992).

The ongoing *Mortenson* litigation does not fall within any of the excepted categories of proceedings set forth in the Anti-Injunction Act.  Further, a decision that would permit the *Mortenson* action to continue in Texas state court would not deprive this Court of jurisdiction over these proceedings, "nullify" these proceedings, *see In re Ford Motor Co. Bronco II Products Litig.*, 1995 WL 489480 *2 (E.D. La. 1995), or otherwise directly affect this action, as the plaintiffs therein seek relief from the non-party homebuilders and not from IPEX.  Enjoining the ongoing proceedings against the homebuilders would be unjust here given that those cases that have proceeded against similar homebuilder defendants have, as discussed above, resulted in much more lucrative settlements than the settlement proposed here.

## E.   If The Court Overrules These Objections And Preliminarily Approves The Settlement, Objectors Request That The Court Certify The Issues For Interlocutory Appeal

In the event that the Court nevertheless decides to grant the Settling Parties' motion for preliminary approval, the issues raised herein – in particular, the breadth of the release, the opt-out process and the injunction against class members proceeding with their pending arbitration and state court claims – be certified for immediate interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and (c).  Such certification is appropriate because an order of preliminary approval in this case would "involve[ ] a controlling question of law as to which there is substantial ground for difference of opinion" and because an immediate appeal would "materially advance the

ultimate termination of the litigation." Given that the issues presented by the Proposed

Settlement will irrevocably impact thousands of homeowners and that the amounts at issue are

substantial, immediate appellate review is necessary and appropriate to protect the interests of

the class.

### III.   CONCLUSION

For the foregoing reasons, the Court should decline to approve the Proposed Settlement.


Date: April 15, 2011                                    Respectfully Submitted,

                                                        MULLIN HOARD & BROWN LLP


                                                        /s/  John G. Turner, III
                                                        John G. Turner, III

John G. Turner, III (TX State Bar # 20320550)
Robert R. Bell (TX State Bar # 00787062)
MULLIN HOARD & BROWN LLP
500 South Taylor, Suite 800, LB #213
P.O. Box 31656
Amarillo, Texas 79120-1656
Phone: 806-372-5050
Fax: 806-371-6230

Garrett W. Wotkyns (TX State Bar # 24025726)
Michael C. McKay (AZ Bar No. 023354), *pro hac vice*
Schneider Wallace Cottrell Brayton Konecky LLP
8501 North Scottsdale Road, Suite 270
Scottsdale, Arizona 85253
Main: (480) 428-0141
Facsimile: (866) 505-8036

Mark A. Chavez
Nance F. Becker
Christian Schreiber
CHAVEZ & GERTLER LLP
42 Miller Avenue
Mill Valley, California 94941
Phone: 415-381-5599
Fax: 415-381-5572

Brian A. Glasser
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Phone: 304-345-6555
Fax: 304-342-1110

## CERTIFICATE OF SERVICE

On the 15th day of April, 2011, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. To the extent any party is not signed up for the ECF system, service will be made on that party by U.S. Mail.

/s/ John G. Turner, III
John G. Turner, III

OBJECTIONS TO THE PROPOSED SETTLEMENT AND OPPOSITION TO MOTION FOR
PRELIMINARY APPROVAL AND BRIEF IN SUPPORT THEREOF